[13 NE3d 1028, 990 NYS2d 442]

In the Matter of RICHARD SANTER, Respondent, v BOARD OF EDUCATION OF EAST MEADOW UNION FREE SCHOOL DISTRICT, Appellant.

In the Matter of BARBARA LUCIA, Respondent, v BOARD OF EDUCATION OF EAST MEADOW UNION FREE SCHOOL DISTRICT, Appellant.

Argued February 19, 2014; decided May 6, 2014

252

## POINTS OF COUNSEL

*Littler Mendelson, P.C.*, New York City (*George B. Pauta, Craig R. Benson* and *Ethan D. Balsam* of counsel), for appellant in the first and second above-entitled proceedings. The Board of Education of East Meadow Union Free School District did not violate Richard Santer's and Barbara Lucia's First Amendment rights given that the March 2, 2007 parking activity did not constitute protected speech, the district's motive in imposing discipline was not Santer's or Lucia's purported speech and the *Pickering* balancing test weighs heavily in favor of the district. (*Locurto v Giuliani*, 447 F3d 159; *Bernheim v Litt*, 79 F3d 318; *Cioffi v Averill Park Cent. School Dist. Bd. of Educ.*, 444 F3d 158; *Blackman v New York City Tr. Auth.*, 491 F3d 95; *Melzer v Board of Educ. of City School Dist. of City of N.Y.*, 336 F3d 185; *United States v Treasury Employees*, 513 US 454; *San Diego v Roe*, 543 US 77; *Rankin v McPherson*, 483 US 378; *Morse v Frederick*, 551 US 393; *Tinker v Des Moines Independent Community School Dist.*, 393 US 503.)

*Sherry B. Bokser*, New York City, and *Richard E. Casagrande*, for respondent in the first above-entitled proceeding. Proper application of the *Pickering* test to the undisputed facts of this case establishes that the Board of Education of East Meadow Union Free School District violated Richard Santer's First Amendment rights when it disciplined him for his lawful speech, on a public street during nonwork hours, about an ongoing labor dispute. (*Garrison v Louisiana*, 379 US 64; *Dun & Bradstreet, Inc. v Greenmoss Builders, Inc.*, 472 US 749; *First Nat. Bank of Boston v Bellotti*, 435 US 765; *Virginia v Black*, 538 US 343; *New York v Ferber*, 458 US 747; *O'Neill v Oakgrove Constr.*, 71 NY2d 521; *Miller v California*, 413 US 15; *Chaplinsky v New Hampshire*, 315 US 568; *Schenck v United States*, 249 US 47; *United States v Treasury Employees*, 513 US 454.)

*Sherry B. Bokser*, New York City, and *Richard E. Casagrande*, for respondent in the second above-entitled proceeding. Proper application of the *Pickering* test to the undisputed facts of this

case establishes that the Board of Education of East Meadow Union Free School District violated Barbara Lucia's First Amendment rights when it disciplined her for participation in the union's lawful, parked-car picketing activity, on a public street during non-work hours, to publicize the ongoing labor dispute. (*Garrison v Louisiana*, 379 US 64; *Dun & Bradstreet, Inc. v Greenmoss Builders, Inc.*, 472 US 749; *First Nat. Bank of Boston v Bellotti*, 435 US 765; *Virginia v Black*, 538 US 343; *New York v Ferber*, 458 US 747; *O'Neill v Oakgrove Constr.*, 71 NY2d 521; *Miller v California*, 413 US 15; *Chaplinsky v New Hampshire*, 315 US 568; *Schenck v United States*, 249 US 47; *United States v Treasury Employees*, 513 US 454.)

*Jay Worona*, Latham, and *Kimberly A. Fanniff* for New York State School Boards Association, amicus curiae in the first above-entitled proceeding. The interest of the Board of Education of East Meadow Union Free School District in the safe and efficient provision of services to students outweighed Richard Santer's alleged exercise of free speech rights through his participation in a protest that intentionally created a health and safety hazard. (*Schenck v United States*, 249 US 47; *Chaplinsky v New Hampshire*, 315 US 568; *Watts v United States*, 394 US 705; *FCC v Pacifica Foundation*, 438 US 726; *Pickering v Board of Ed. of Township High School Dist. 205, Will Cty.*, 391 US 563; *Connick v Myers*, 461 US 138; *Rankin v McPherson*, 483 US 378; *Waters v Churchill*, 511 US 661; *Lewis v Cowen*, 165 F3d 154; *Jackler v Byrne*, 658 F3d 225.)

### OPINION OF THE COURT

Abdus-Salaam, J.

This appeal involves a teachers' union picketing demonstration that took place on a public street in front of Woodland Middle School (Woodland) in Nassau County. On the morning of March 2, 2007, petitioners-respondents Richard Santer and Barbara Lucia and other members of the East Meadow Teachers Association (EMTA) displayed picketing signs from their cars parked where parents were dropping their children off at school. Respondent-appellant Board of Education of the East Meadow Union Free School District (the District) charged petitioners with misconduct related to the demonstration, alleging that petitioners created a health and safety risk by parking their cars so that students had to be dropped off in the middle of the street instead of at curbside. After their respective hearings, petitioners were found guilty of misconduct and directed to pay a fine.

Petitioners thereafter commenced these proceedings to vacate the arbitration awards, arguing that the disciplinary proceedings commenced against them, and the discipline ultimately imposed, violated their right to free speech under the First Amendment to the United States Constitution. Supreme Court denied the petitions but the Appellate Division reversed in each case. Applying the two-part balancing test from *Pickering v Board of Ed. of Township High School Dist. 205, Will Cty.* (391 US 563 [1968]), the court concluded, first, that petitioners' speech addressed a matter of public concern and, second, that the District failed to meet its burden of demonstrating that petitioners' exercise of their free speech rights "so threatened the school's effective operation as to justify the imposition of discipline" (*Matter of Santer v Board of Educ. of E. Meadow Union Free Sch. Dist.*, 101 AD3d 1026, 1028 [2d Dept 2012]; *Matter of Lucia v Board of Educ. of E. Meadow Union Free Sch. Dist.*, 109 AD3d 545, 547 [2d Dept 2013]).

We agree with the Appellate Division that the picketing demonstration, a form of "speech" protected by the First Amendment, addressed a matter of public concern. We come out differently, however, on the second step of the *Pickering* test. Viewing the record evidence in light of established federal precedent, we conclude that petitioners' interests in engaging in constitutionally protected speech in the particular manner that was employed on the day in question were outweighed by the District's interests in safeguarding students and maintaining effective operations at Woodland. The District also satisfied its burden of proving that the discipline imposed here was justified because petitioners created a potential yet substantial risk to student safety and an actual disruption to school operations. We therefore reverse.

I.

At all relevant times, petitioners were teachers at Woodland and members of the EMTA, the collective bargaining unit for the District's teachers. The collective bargaining agreement (CBA) expired on September 1, 2004, and for several years following its expiration, the District and the EMTA were unable to reach an agreement over a new CBA. To express their dissatisfaction with the lack of progress, teachers at Woodland engaged in weekly protest activities, including picketing, for over two years prior to the demonstration on March 2, 2007. The teachers generally picketed on Monday and Friday mornings, usually

by walking along the sidewalk in front of Woodland carrying union signs as students were arriving for school. Woodland includes grades six through eight, and its students are between 11 and 14 years old. Students typically begin arriving at Woodland at 7:30 a.m. for homeroom class, which begins at 8:12 a.m. Teachers must report to work by 7:55 a.m.; those who drive to Woodland generally park in a teachers' lot behind the school.

Woodland is located on the north side of Wenwood Drive, a relatively narrow, two-way public street that runs in front of the school's main entrance. On an average school day morning, approximately 100 parents drive down Wenwood Drive, pull alongside the curb, and drop off their children at school. The north side of the street has two curb cuts giving access to the sidewalk and pathways that lead to the school buildings. Children exiting cars on the north side generally may proceed directly from the curb to the school without setting foot in the street. Children who are dropped off on the south side of the street, however, must wait at the curb and cross the street as traffic permits.

During the week of February 26, 2007, Woodland EMTA members held a meeting, at which Santer was present,[1] to plan a picketing demonstration to be held on March 2nd. The weather forecast called for heavy rain that day, and the members, evidently not wanting to stand out in the rain but also not wanting to cancel the demonstration due to inclement weather, voted to park their cars along Wenwood Drive and place picketing signs in their car windows so that parents, seeing the signs as they drove by, would be reminded of the ongoing labor negotiations. Santer did not vote because he was the EMTA's building president but he "spoke against" the proposed parking demonstration. According to his hearing testimony, Santer told his colleagues that they could not park in front of the curb cuts on Wenwood Drive because it was illegal to block access to them.[2] The members amended their vote to keep the curb cuts clear, but Santer still "never personally supported"

---

1. The record does not indicate whether Lucia attended the meeting.

2. Santer testified at the hearing that the EMTA members originally voted "to park completely along the curb and leave no space" between the cars. Santer "objected to that," telling the members that, from a legal perspective, they "needed to keep the curb cut clear, so that parents could . . . pull to the curb and drop[ ]off children." Santer "was unhappy with what [the EMTA members] were doing" and "thought they were going too far." He also

the demonstration because he was concerned about student safety. Particularly, Santer "didn't want someone doing something stupid [like] pulling out at 7:50 [a.m.] and hitting a kid."

At approximately 7:30 a.m. on March 2nd, 16 EMTA members parked their cars—eight in total—in front of Woodland along both sides of Wenwood Drive. The weather was rainy as forecasted. The participants parked in legal parking spots off of school property and, as planned, did not block any of the curb cuts. Santer testified that the participants placed picketing signs in their car windows facing the street "so parents going by would see them."

While the participants' cars were parked on Wenwood Drive, parents dropping off their children could not pull their cars alongside the curb as they regularly did each morning. Because the curb cuts were only about one car-length long, parents would have had to parallel park into them to reach the curb, which proved too difficult on such a narrow two-way street. Consequently, parents driving on both sides of Wenwood Drive had to stop their cars in the middle of the street to drop off their children. This caused traffic to become congested in both directions, and children had to cross through the traffic in the rain to reach the school.

At around 7:30 a.m., Woodland's dean of students, Terrence Chase, and principal, James Lethbridge, observed the teachers' parked cars from inside the school; they could also see the ensuing traffic backup on Wenwood Drive and students having to exit cars in the middle of the street. Chase and Lethbridge testified that the cars were parked end-to-end on both sides of the street for the entire length of the school. The administrators agreed that traffic on Wenwood Drive was much worse than usual as a result of the parked cars, and that they had never before seen parents drop off children in the middle of the street as they were required to do that morning. According to Lethbridge, the parked cars created "a very dangerous situation" by forcing children to exit cars in the middle of the street and "walk[ ] between cars" to get to the school. Neither administrator, nor any District official, asked the participants to move their cars or assisted children in crossing the street, however. In

---

"wanted to make sure [the demonstration] was a community information activity, and not a[bout] blocking the egress to school."

fact, Lethbridge and Chase watched the events unfold from inside the school building.[3]

As the parents' cars became more and more backed up, Lethbridge called the police because, in his judgment, they were best equipped to handle the "traffic situation." Meanwhile, secretaries in Woodland's main office fielded a number of phone calls from parents concerned about the traffic backup on Wenwood Drive. Several teachers also called to report that they would be late because of the traffic. Ultimately, 16 of the 19 teachers who arrived late to work on March 2nd cited traffic as their excuse. To compensate for the unprecedented amount of tardy teachers, Chase and Lethbridge had to arrange for coverage of homeroom classes so children would not be left unattended in the classrooms.

The parking demonstration concluded at approximately 7:50 a.m. It is undisputed that no child was hurt during the demonstration. Also, the police never intervened because, according to Lethbridge, they arrived after the demonstration had concluded. As Santer entered the school (he and Lucia arrived on time), Lethbridge directed him to his office, where he asked Santer to explain why he and the other teachers had parked in front of the school and blocked the drop off area. Santer stated that the teachers were informing the public about the EMTA's ongoing labor dispute with the District and that they had a legal right to park along Wenwood Drive, as signs on that street only prohibited parking between 8:00 a.m. and 4:00 p.m. Lethbridge later asked Lucia if she had participated in the demonstration, and Lucia refused to respond to his questions because they involved what she did on her personal time.

On March 16, 2007, the District commenced disciplinary proceedings pursuant to Education Law § 3020-a against petitioners and other teachers who had allegedly participated in the picketing demonstration. The District preferred a single charge of misconduct against petitioners, which stated that, on March 2nd, they

"intentionally created a health and safety risk by purposely situating [their] vehicle[s] alongside the

---

**3.** Chase testified that, from his vantage point inside the school, he did not see signs displayed in any of the cars parked along Wenwood Drive. This testimony conflicted, at least somewhat, with Santer's testimony and petitioners' assertions that the parked cars displayed picketing signs. The arbitrators appear to have resolved this factual dispute in favor of petitioners, however, and that determination need not be disturbed on appeal.

curb on Wenwood Drive in front of the Woodland Middle School in order to preclude children from being dropped off at curbside. The action resulted in children being dropped off in the middle of the street which resulted in an otherwise avoidable and unnecessary health and safety hazard."

There is no dispute that this was the first time the District took disciplinary action against Woodland teachers for picketing over the collective bargaining dispute, and that teachers at Woodland have continued to hold weekly picketing demonstrations without receiving discipline.

After their respective hearings, petitioners were found guilty of the misconduct charge and assessed a fine of $500 to Santer and $1,000 to Lucia. In their decisions, the arbitrators acknowledged that the parking demonstration was conducted on public property while petitioners were off duty, and that their cars were legally parked. The arbitrators nonetheless concluded that petitioners intended to (and did) disrupt the student drop-off on Wenwood Drive, and that the parked cars created a health and safety risk to children who had to be dropped off in the middle of a busy street in the rain.[4] While it was "fortunate" that no child was injured, the arbitrators determined that fact was irrelevant to their findings that petitioners' intentional conduct posed a potential threat to student safety.

Petitioners thereafter commenced separate CPLR article 75 proceedings to vacate the arbitration awards imposed against them. Supreme Court denied the petitions, holding that the arbitrators' determinations do not violate a strong public policy, are not irrational, and do not exceed a specific enumerated limitation of the arbitrators' power.[5] Petitioners appealed.

---

**4.** The arbitrator presiding over Lucia's proceeding rejected her claim that the District failed to adequately prove that she was physically present during the parking demonstration. The arbitrator credited Chase's testimony that he recognized Lucia's black Chevrolet Camaro because he had developed "familiarity" with teachers' cars after having regularly parked with the teachers in the school parking lot.

**5.** In *Matter of Lucia*, Supreme Court additionally noted that, although it was "mindful of the fact that Lucia, and other similarly situated teachers, have a constitutionally protected right to engage in union activity," it declined to vacate the arbitration award on public policy grounds because that exception "is 'extremely narrow' and the exercise of teachers' free assembly and

The Appellate Division, in separate decisions, reversed the Supreme Court orders, granted the petitions, and vacated the arbitration awards (see *Matter of Santer*, 101 AD3d at 1026; *Matter of Lucia*, 109 AD3d at 546). The court first held that the evidence at the hearings provided a rational basis for the arbitrators' decisions, and the awards were not arbitrary and capricious (*Matter of Santer*, 101 AD3d at 1027; *Matter of Lucia*, 109 AD3d at 547). Noting that petitioners argued that the District's disciplinary actions violated their First Amendment rights, the court proceeded to analyze those claims under *Pickering* (see *Matter of Santer*, 101 AD3d at 1027-1028). Applying the first step of the *Pickering* test, the court determined that petitioners' " 'speech' regarding collective bargaining issues indisputably addressed matters of public concern" (*id.* at 1028; *Matter of Lucia*, 109 AD3d at 547). As for the second step, which requires balancing the employee's interest in free speech against the employer's interest in effective government operations, the court concluded that "despite the evidence establishing that the manner in which the protest was carried out interfered with the safe and effective drop-off of students" (*Matter of Santer*, 101 AD3d at 1028), the District failed to meet its burden of showing that petitioners' exercise of their First Amendment "rights so threatened the school's effective operation as to justify the imposition of discipline" (*id.*; *Matter of Lucia*, 109 AD3d at 547). The court further cautioned in *Matter of Santer* that "[t]he disciplinary measures imposed [here] . . . would likely have the effect of chilling speech on an important matter of public concern—the negotiation of a collective bargaining agreement" (101 AD3d at 1029).[6]

The District now appeals as of right pursuant to CPLR 5601 (b) (1) from both Appellate Division orders of reversal.

## II.

Education Law § 3020-a (5) requires a court to review an arbitrator's determination pursuant to CPLR 7511, which

---

speech rights are circumscribed to the extent that such exercise endangers the safety of children" (32 Misc 3d 1208[A], 2011 NY Slip Op 51210[U], *2 [2011] [citation omitted]).

6. In *Matter of Lucia*, Justice Roman "concur[red] in the result on constraint of" *Matter of Santer*, stating that "[t]he mandate of the school district to provide for the safety of the children and to ensure the proper functioning of the school is paramount, and overrides any manifestation of First Amendment rights that were embodied in this protest by the teachers" (109 AD3d at 548 [Roman, J., concurring] [citations omitted]).

permits vacatur of an award on three narrow grounds: "it violates a strong public policy, is irrational, or clearly exceeds a specifically enumerated limitation on the arbitrator's power" (*Matter of United Fedn. of Teachers, Local 2, AFT, AFL-CIO v Board of Educ. of City School Dist. of City of N.Y.*, 1 NY3d 72, 79 [2003] [internal quotation marks omitted]; *see* CPLR 7511 [b] [1]). "[T]he scope of the public policy exception to an arbitrator's power to resolve disputes is extremely narrow" (*Matter of United Fedn. of Teachers*, 1 NY3d at 80), and "[c]ourts will only intervene in the arbitration process in those 'cases in which public policy considerations, embodied in statute or decisional law, prohibit, in an absolute sense, particular matters being decided or certain relief being granted by an arbitrator' " (*City School Dist. of the City of N.Y. v McGraham*, 17 NY3d 917, 919 [2011], quoting *Matter of Sprinzen [Nomberg]*, 46 NY2d 623, 631 [1979]; *see also Matter of New York State Correctional Officers & Police Benevolent Assn. v State of New York*, 94 NY2d 321, 327 [1999]). "Where, as here, parties are subject to compulsory arbitration, the award must satisfy an additional layer of judicial scrutiny—it 'must have evidentiary support and cannot be arbitrary and capricious' " (*McGraham*, 17 NY3d at 919, quoting *Matter of Motor Veh. Acc. Indem. Corp. v Aetna Cas. & Sur. Co.*, 89 NY2d 214, 223 [1996]).

Although the Appellate Division determined that the awards satisfied the "additional layer of judicial scrutiny" (*McGraham*, 17 NY3d at 919) in that they are supported by a rational basis and are not arbitrary and capricious (*see Matter of Lucia*, 109 AD3d at 547; *Matter of Santer*, 101 AD3d at 1027), the court did not identify which of the narrow grounds under CPLR 7511 (b) (1) it relied upon in vacating the awards (*see generally Matter of United Fedn. of Teachers*, 1 NY3d at 79). Parsing the court's reasoning, however, it appears the awards were vacated on the ground that they violate a strong public policy against disciplinary actions that "chill[ ]" teachers' constitutionally protected speech related to the collective bargaining process (*Matter of Santer*, 101 AD3d at 1029).

It is well settled that a public employer may not discharge or retaliate against an employee based on that employee's exercise of the right of free speech (*see Rankin v McPherson*, 483 US 378, 384 [1987]; *see also Locurto v Giuliani*, 447 F3d 159, 183 [2d Cir 2006]). Equally well settled, however, is that "the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in

connection with regulation of the speech of the citizenry in general" (*Pickering*, 391 US at 568), meaning that public employers "may impose restraints on the First Amendment activities of its employees that are job-related even when such restraints would be unconstitutional if applied to the public at large" (*Melzer v Board of Educ. of City School Dist. of City of N.Y.*, 336 F3d 185, 192 [2d Cir 2003], citing *United States v National Treasury Empls.* [*National Treasury*], 513 US 454, 465 [1995]). Thus, although "public employees like . . . teacher[s] do not leave their First Amendment rights at the schoolhouse door, . . . it is plain that those rights are somewhat diminished in public employment" (*Melzer*, 336 F3d at 192).

The District argues that, as a threshold matter, petitioners' parking demonstration did not qualify as a form of "speech" entitled to First Amendment protection.[7] To support this claim, the District relies on the Supreme Court's decision in *Texas v Johnson* (491 US 397 [1989]), in which the Court explained that "conduct possesses sufficient communicative elements to bring the First Amendment into play" if there was " 'an intent to convey a particularized message . . . , and the likelihood was great that the message would be understood by those who viewed it' " (491 US at 404, quoting *Spence v Washington*, 418 US 405, 410-411 [1974] [alterations omitted]).

It is established that, as a general matter, "peaceful picketing" is an "expressive activit[y] involving 'speech' protected by the First Amendment" (*United States v Grace*, 461 US 171, 176-177 [1983], citing *e.g. Carey v Brown*, 447 US 455, 460 [1980]; *Gregory v Chicago*, 394 US 111, 112 [1969]). The arbitrators determined here that, on the morning of March 2, 2007, petitioners engaged in picketing from their cars parked on Wenwood Drive. The evidence at the hearings provided a rational basis for this finding of fact, affirmed by the courts below, and

---

7. This argument was one of the first raised in the District's briefs to this Court. When pressed on this point at oral argument, however, the attorney for the District responded that, for the purposes of his argument, he would focus instead on the District's claims related to the second step of the *Pickering* balancing test. Although not conceding that petitioners' conduct constituted speech (*cf. Johnson*, 491 US at 405 [noting that the State of Texas "conceded for purposes of its oral argument" that Johnson's burning of an American flag "was expressive conduct"]), the District's attorney later stated at argument that, to the extent petitioners displayed signs during the demonstration and those signs related to collective bargaining, their conduct "is likely protected speech."

had it been made in error, we still would not be compelled to vacate the arbitration awards (*see Matter of New York State Correctional Officers & Police Benevolent Assn.*, 94 NY2d at 326 ["(E)ven in circumstances where an arbitrator makes errors of law or fact, courts will not assume the role of overseers to conform the award to their sense of justice"]; *Matter of Sprinzen*, 46 NY2d at 629).[8] Moreover, although the arbitrators determined that petitioners intended to create a disruption by parking in the student drop-off area, that finding does not, under these circumstances, deprive petitioners' picketing activity of its status as "speech." Accordingly, we conclude that petitioners' demonstration constituted "speech" subject to First Amendment strictures, and now consider that speech in the context of the *Pickering* balancing test.

Under *Pickering*, the determination whether a public employer has properly disciplined a public employee "for engaging in speech requires 'a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the [public] . . . employer, in promoting the efficiency of the public services it performs through its employees' " (*Rankin*, 483 US at 384, quoting *Pickering*, 391 US at 568). This balancing test recognizes that the public employer must be permitted a level of control over its employees so it may fulfill essential services, such as public safety and education, efficiently and effectively (*see Connick v Myers*, 461 US 138, 150-151 [1983]; *see also Waters v Churchill*, 511 US 661, 675 [1994 plurality]), but also that "[v]igilance is necessary" to ensure public employers do not use their authority "to silence discourse . . . not because it hampers public functions but simply because superiors disagree with the content of [the] employees' speech" (*Rankin*, 483 US at 384).

The *Pickering* test involves a two-part inquiry, the first part being "whether the speech which led to an employee's discipline

___

8. Even if picketing were not already considered an expressive activity for First Amendment purposes (*see e.g. Grace*, 461 US at 176), the demonstration here still qualifies as "expressive conduct" under *Johnson*. Enough record evidence exists to support petitioners' assertion that the demonstration was "inten[ded] to convey a particularized message" related to the EMTA's stalled collective bargaining negotiations with the District. And given that the teachers had picketed in front of Woodland about that same issue for years before March 2nd, it seems likely that this message would have been understood by its intended audience: parents dropping their children off for school, many of whom were probably familiar with the protracted labor dispute from having observed the teachers' prior picketing demonstrations.

relates to a matter of public concern" (*Melzer*, 336 F3d at 193, citing *Rankin*, 483 US at 384; *see Connick v Myers*, 461 US 138, 146 [1983]). "Speech deals with matters of public concern when it can 'be fairly considered as relating to any matter of political, social, or other concern to the community,' . . . or when it 'is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public' " (*Snyder v Phelps*, 562 US —, —, 131 S Ct 1207, 1216 [2011], quoting *San Diego v Roe*, 543 US 77, 83-84 [2004], and *Connick*, 461 US at 146). Whether a public employee's speech addresses a matter of public concern is a question of law to be determined in light of "the content, form, and context of a given statement, as revealed by the whole record" (*Connick*, 461 US at 147-148; *see Bose Corp. v Consumers Union of United States, Inc.*, 466 US 485, 499 [1984]).

We agree with the Appellate Division that petitioners' speech related to a matter of public concern (*see e.g. Snyder*, 562 US at —, 131 S Ct at 1216). The ongoing labor dispute between the EMTA and the District, although of personal concern to petitioners and other teachers, is a political and social issue of broad public import (*see generally* 562 US at —, 131 S Ct at 1217; *cf. State Emp. Bargaining Agent Coalition v Rowland*, 718 F3d 126, 132, 134 n 7 [2d Cir 2013] ["the 'economic' advocacy of public employee unions touches directly on matters of public concern"]). Moreover, the picketing demonstration was conducted outside the workplace on a public street and was addressed to a public audience: parents dropping their children off for school (*see National Treasury*, 513 US at 466; *see also Snyder*, 562 US at —, 131 S Ct at 1217). The District suggests that the "real objective" of the demonstration was to entangle parents in the labor dispute so the District would be pressured to give in to the EMTA's demands. However, the arbitrators did not conclude, nor does the record support, that petitioners intended to create a disruption for any reason other than to bring attention to the collective bargaining dispute. Thus, the record as a whole indicates that petitioners' speech was on a matter of public concern and entitled to First Amendment protection (*see Connick*, 461 US at 147-148).

Since petitioners' speech satisfies *Pickering*'s first step, we now move on to the second, balancing step of that test (*see e.g. Rankin*, 483 US at 388). Under it, we must weigh the employee's First Amendment rights against the public employer's interest " 'in promoting the efficiency of the public services it performs

through its employees' " (*id.*, quoting *Pickering*, 391 US at 568; *see Connick*, 461 US at 150). In performing the balancing, the employee's speech "will not be considered in a vacuum; the manner, time, and place of the employee's expression are relevant," as is the extent that the speech "interferes with the regular operation" of the public employer's enterprise (*Rankin*, 483 US at 388; *see e.g. Melzer*, 336 F3d at 197). To satisfy the second step of *Pickering*, the public employer bears the burden of showing that the discipline arising out of the employee's protected activity was justified (*see National Treasury*, 513 US at 466, citing *Rankin*, 483 US at 388; *see also e.g. Melzer*, 336 F3d at 193 ["(T)he government has the burden of showing that despite First Amendment rights the employee's speech so threatens the government's effective operation that discipline of the employee is justified"]).

The interests the District asserts in this case are legitimate: ensuring the safety of its students and maintaining orderly operations at Woodland. The District argues that the evidence adduced at the hearings showed that the parking demonstration created dangerous traffic conditions in front of the school that could have injured a student and that caused actual disruption to the school's operations. This evidence, the District maintains, was sufficient to justify its discipline of petitioners, and it was not required to prove, as the Appellate Division decisions suggest, that a student was actually injured for the *Pickering* balance to tip in the District's favor. We agree.

"It cannot be disputed that the State has a public policy in favor of protecting children" (*McGraham*, 17 NY3d at 919-920), and that a school has a duty to ensure the safety of its students "in its physical custody or orbit of authority" (*Chainani v Board of Educ. of City of N.Y.*, 87 NY2d 370, 378 [1995]; *see also Vernonia School Dist. 47J v Acton*, 515 US 646, 654 [1995] ["(T)eachers . . . stand *in loco parentis* over the children entrusted to them"]). Petitioners acknowledge that the District has a significant interest in ensuring that Woodland students arrive to school safely. The Appellate Division, however, does not appear to have given "full consideration" to the District's interest in the "effective and efficient fulfillment" of this duty (*Connick*, 461 US at 150). The court concluded that because no District official asked petitioners to move their cars and no student was hurt on account of the parking demonstration, "the danger presented by the legally parking teachers could not have been substantial" and the District failed to meet its burden

under *Pickering*'s second step (*Matter of Santer*, 101 AD3d at 1028-1029; *see Matter of Lucia*, 109 AD3d at 547 [dismissing the award "for the same reasons as those stated in *Matter of Santer*"]).

It is true that "[t]he more the employee's speech touches on matters of significant public concern, the greater the level of disruption to the government [employer] that must be shown" (*Lewis v Cowen*, 165 F3d 154, 162 [2d Cir 1999]; *see Melzer*, 336 F3d at 197). As the Supreme Court has explained, however, "an employer is never required 'to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action' " (*Lewis*, 165 F3d at 163, quoting *Connick*, 461 US at 152). Interpreting this mandate, the Second Circuit has held that a public employer's "right to discharge an employee by reason of his [or her] speech in matters of public importance does not depend on the employer's having suffered *actual* harm resulting from the speech" (*Pappas v Giuliani*, 290 F3d 143, 151 [2d Cir 2002]; *see e.g. Melzer*, 336 F3d at 197; *Heil v Santoro*, 147 F3d 103, 109 [2d Cir 1998]). While evidence of actual harm or disruption is certainly "persuasive" (*Melzer*, 336 F3d at 197), the public employer need only "make a substantial showing that the speech is . . . likely to be disruptive" to satisfy the balancing test and meet its burden under *Pickering* (*Waters*, 511 US at 674 [plurality opinion]; *see also id.* at 673 [giving "substantial weight to government employers' reasonable predictions of disruption"]; *Pappas*, 290 F3d at 151 ["The employee's speech must be of such nature that the government employer reasonably believes that it is likely to interfere with the performance of the employer's mission"]).

Considering the record evidence under these standards, we conclude that the District met its burden of proving that petitioners' speech was disruptive enough to justify the imposition of discipline (*see e.g. Melzer*, 336 F3d at 197). Thankfully, no student was injured on account of the parking demonstration, but the District nonetheless established that petitioners' actions created a potential yet substantial risk to student safety (*see Waters*, 511 US at 675).

The evidence adduced at the hearings showed that petitioners and the other participating teachers purposefully blocked a familiar student drop-off point by parking their cars along both sides of Wenwood Drive. Lethbridge and Chase observed that the parked cars caused traffic to become congested and

prevented children from safely disembarking at the curb. Instead, students exited cars from the middle of the street in the rain. Wenwood Drive is a relatively small suburban road, but that does not mean it was safe for students to exit amidst an unexpected traffic jam during the crush of morning drop-off. Tellingly, Santer testified that he never supported the parking activity because of the safety risk to students and the potential that the teachers would "block[ ] egress" to Woodland. And in Lethbridge's view, the demonstration did, in fact, create "a very dangerous situation" because it forced children to "walk[ ] between cars" to reach the school. Lethbridge also stated that the teachers' cars blocked the full length of the street where the children were exiting, and that the cars were parked so close together that children had difficulty reaching the curb. Although Lethbridge did not intervene in the demonstration or help students cross the street, he called the police for assistance with the disruptive traffic situation. This evidence, viewed as a whole, led the arbitrators to determine that petitioners created a health and safety hazard, and we now conclude that it demonstrated a potential risk to student safety that outweighed the First Amendment value of petitioners' speech about collective bargaining (see Waters, 511 US at 681).[9]

Further, the "manner, time, and place" of petitioners' speech (Rankin, 483 US at 388) tips the balance in favor of the District. The arbitrators found that petitioners intended for the parking activity to create a disruption, and the District presented evidence of "actual disruption" to the school's effective operation (Melzer, 336 F3d at 197). Particularly, the traffic caused by the parking demonstration led 16 teachers to arrive late to work, requiring that homeroom classes be covered so students were not left unsupervised.[10] A number of parents and teachers also called the school to express their concern about the traffic along

_____

**9.** The dissent asserts that we should not be permitted to "ignore[ ] the Appellate Division's conclusions" regarding the disruptiveness of petitioners' speech or otherwise diverge from the Appellate Division's constitutional analysis (dissenting op at 274). "[T]he Appellate Division was well within its authority to consider the teachers' claims and apply the Pickering balancing test to the facts in the record" (id.). But the balancing of the competing interests under Pickering is undoubtedly a question of law (see e.g. Waters, 511 US at 668; Jackler v Byrne, 658 F3d 225, 237 [2d Cir 2011]), and contrary to the dissent's view, we are not constrained to accept the Appellate Division's application of the Pickering test to the facts of this case.

**10.** The dissent, accusing the Court of having engaged in "dubious" factfinding, contends that "there is scant record evidence that the parking demonstration caused teachers to arrive late" (dissenting op at 275-276). The

Wenwood Drive. It is true, as the Appellate Division noted, that petitioners' "parking was entirely legal" (*Matter of Santer*, 101 AD3d at 1028), but while that weighs in petitioners' favor, it does not outbalance the evidence of disruption.[11]

We are mindful that teachers "do not leave their First Amendment rights at the schoolhouse door" (*Melzer*, 336 F3d at 192; *Shelton v Tucker*, 364 US 479, 487 [1960]), and that courts must be vigilant in ensuring that teachers are not disciplined "simply because superiors disagree with the content of [their] speech" (*Rankin*, 483 US at 384). The evidence here, however, does not indicate that the District's disciplinary actions were motivated by the content of petitioners' speech. EMTA members have picketed about the collective bargaining dispute almost every week since the CBA expired in September 2004. The District never took disciplinary action before or after the parking demonstration on March 2, 2007, and since that event, teachers have continued to picket in front of Woodland. Thus, there is no evidence that the discipline here has "chilled" or will "chill" speech on matters of public concern or discourage union picketing. And although petitioners suggest that the District's actions were intended to silence their constitutionally protected speech, that assertion is not supported by the record, which indicates that, as the District contends, petitioners were disciplined because the parking demonstration was disruptive and created potentially unsafe conditions for students.

---

testimony and documentary evidence presented at both hearings, which largely was not refuted by petitioners, showed that 16 teachers signed in late to work on March 2nd because of traffic. We need not discount or disregard this record evidence of actual disruption, as the dissent suggests, simply because it was not a factor in the Appellate Division's *Pickering* analysis. Ironically, while asserting that this Court has engaged in impermissible fact-finding and exceeded our role as a court of law (*see id.* at 274, 276), the dissent has no qualms about making credibility determinations to bolster its conclusions (*see* dissenting op at 276 [characterizing the school administrators' hearing testimony as "self-serving"]).

11. The Appellate Division also asserted that the District would have "no recourse" over members of the public who parked on Wenwood Drive in compliance with the posted street signs (*Matter of Santer*, 101 AD3d at 1028). Whether or not this is true, it has little bearing on whether the District demonstrated that petitioners' *particular* parking activity caused a substantial disruption *in these circumstances*. Moreover, the District, as a public employer, "may impose restraints on the First Amendment activities of its employees . . . even when such restraints would be unconstitutional if applied to the public at large" (*Melzer*, 336 F3d at 192).

## III.

We conclude that, although petitioners' speech as embodied in the parking demonstration was protected by the First Amendment, petitioners' interests in engaging in that constitutionally protected speech in a manner that interfered with the safety of students were outweighed by the District's interests in maintaining an orderly, safe school, and the District satisfied its burden under *Pickering* of proving that the discipline imposed here was justified. Petitioners have relied solely on their First Amendment claims as the basis for vacating the arbitration awards; having determined that those claims lack merit, we can discern no other reason to conclude that the arbitration awards violate a strong public policy, exceed a specifically enumerated limitation on the arbitrators' power, or are in any way irrational.

Accordingly, in each case, the Appellate Division order should be reversed, with costs, the petition denied, and the arbitration award confirmed.

Smith, J. (concurring). I concur only in the result, because I do not agree with the majority's view that the conduct of these petitioners was speech or expression protected by the First Amendment. I am troubled by the implication that intentionally disruptive and dangerous conduct can, if it is designed for the purpose of calling attention to the actor's message, qualify for First Amendment protection. As the majority acknowledges, the arbitrators here found:

> "that petitioners intended to (and did) disrupt the student drop-off on Wenwood Drive, and that the parked cars created a health and safety risk to children who had to be dropped off in the middle of a busy street in the rain" (majority op at 259 [footnote omitted]).

Indeed, the arbitrators found in substance that disruption of traffic, and the resulting safety hazard, were the purpose and primary effect of petitioners' activity. The arbitrator in *Lucia* found:

> "the only purpose, or reasonably expectable result, in parking cars at the curb would have been, at the very least, to slow down and inconvenience the drop-off process in order to draw additional attention to the contract negotiations."

Similarly, the arbitrator in *Santer* found:

> "the Respondent intentionally created a health and safety risk by purposely situating his vehicle alongside the curb on Wenwood Drive in front of the Woodland Middle School in order to preclude children from being dropped off at curbside."

In the ordinary case, these findings would be binding upon us. This may not be true where First Amendment rights are at issue (*see New York Times Co. v Sullivan*, 376 US 254, 284-285 [1964] [courts should examine for themselves the question of whether particular speech is protected]), but for me that question is academic, because if I were to review the question de novo I would reach the same conclusion as the arbitrators. The teachers' cars were parked in such a way as to cause the maximum possible disruption without violating the parking laws. The school principal testified:

> "Q How were the cars parked?
>
> "A Very close together. What I mean by that is, the front is very close up to the back of the car in front of it and very sinsynchly [sic] placed -- strategically placed."

Indeed, Santer testified that the teachers would have created even more disruption, by blocking the curb cuts, if he had not told them they could not get away with it: "The original vote was to park completely along the curb and leave no space."

Thus this case cannot be decided on the premise that the demonstration in question was no more than a wet-weather substitute for normal picketing. The majority says the protesters intended that "parents, seeing the signs [in the car windows] as they drove by, would be reminded of the ongoing labor negotiations" (majority op at 256), but that is not what the record shows or what the arbitrators found. Unquestionably, the teachers did want to remind the parents about the labor negotiations—but it was the traffic disruption, not the relatively inconspicuous signs in the car windows, that was to serve as the more effective reminder.

While, as the majority says (majority op at 262), it is well established that ordinary, non-disruptive picketing is protected by the First Amendment, it is equally well established that disruptive picketing is not (*see Hotel & Restaurant Employees v Wisconsin Employment Relations Bd.*, 315 US 437, 440 [1942] [upholding a Wisconsin statute that prohibited picketing intended to "obstruct or interfere with free and uninterrupted

use of public roads"]). The picketing in this case was of the unprotected kind.

Disruptive or dangerous conduct does not acquire First Amendment protection simply because its purpose is to promote an idea. The Supreme Court's leading cases on First Amendment protection for expressive conduct, *United States v O'Brien* (391 US 367 [1968]) and *Texas v Johnson* (491 US 397 [1989]), make that clear. *O'Brien* involved the burning of a draft card; *Johnson*, the burning of an American flag. Both of these acts were merely expressive; neither was intended to, or did, create any disruption or danger. Even so, in *O'Brien*, the Court, in an opinion by Chief Justice Warren, rejected the First Amendment claim, holding that the governmental interest in assuring the availability of draft cards was sufficient to justify O'Brien's conviction (391 US at 382). This case is a fortiori from *O'Brien*.

For these reasons, I would not reach the issue that the majority decides—whether the discipline of petitioners was justified under *Pickering v Board of Ed. of Township High School Dist. 205, Will Cty.* (391 US 563 [1968]). The *Pickering* test serves to identify cases in which speech or expression by a public employee that would ordinarily have First Amendment protection may be limited in the interest of efficient and effective government. In this case, the public-employee status of petitioners is irrelevant to the constitutional issue. Citizens who were not public employees would have no more right than these petitioners to park their cars "strategically" in order to make it more difficult for children to get to school.

RIVERA, J. (dissenting). I dissent from the majority's decision because I can find no legal or factual error in the Appellate Division's application of the *Pickering* balancing test to the facts of these cases. I would affirm the Appellate Division's orders and its conclusion that the District violated the teachers' free speech rights.

"[S]peech on public issues occupies the 'highest rung of the hierarchy of First Amendment values,' and is entitled to special protection" (*Connick v Myers*, 461 US 138, 145 [1983], citing *NAACP v Claiborne Hardware Co.*, 458 US 886, 913 [1982]; *Carey v Brown*, 447 US 455, 467 [1980]). Accordingly, a public employer's authority to regulate a public employee's speech on matters of public interest is subject to constitutional limits (*see Connick*, 461 US at 147). In determining whether a public employer may lawfully act against a public employee based on

the employee's speech, courts must balance the rights of the employee against those of the employer "in promoting the efficiency of the public services it performs through its employees" (*Pickering v Board of Ed. of Township High School Dist. 205, Will Cty.*, 391 US 563, 568 [1968]).

The "state's burden in justifying a particular [action] varies depending upon the nature of the employee's expression" (*Connick*, 461 US at 150). Thus, the U.S. Supreme Court has "caution[ed] that a stronger showing may be necessary if the employee's speech more substantially involved matters of public concern" (*id.* at 152). In other words, the greater the free speech interest, the stronger the showing necessary to carry the State's burden (*id.* at 150-152). This, of course, is logical where matters of public concern are involved. Otherwise, a bare claim of mere inconvenience would be sufficient to overcome the interest in speech on a matter of the utmost public importance.

In the cases on appeal, the teachers' speech involved matters of public concern, the type of speech that enjoys the greatest First Amendment protection because of its importance to our democratic society (*see Pickering*, 391 US at 573; *San Diego v Roe*, 543 US 77, 82 [2004]). As the U.S. Supreme Court has recognized, discussion about the operation of public schools "is vital to informed decision-making by the electorate" (*Pickering*, 391 US at 571-572). Moreover, "[t]eachers are, as a class, the members of a community most likely to have informed and definite opinions as to how funds allotted to the operations of the schools should be spent. Accordingly, it is essential that they be able to speak out freely on such questions without fear of [retaliation]" (*id.* at 572). Thus, these cases involve speech in an area of the utmost public importance uttered by the very people in the best position to inform public debate.

A finding that the teachers' speech was disruptive of the school district's public responsibility, justifying discipline in these cases, requires the school district to carry a heavy burden (*United States v Treasury Employees*, 513 US 454, 466 [1995]; *Rankin v McPherson*, 483 US 378, 388 [1987]; *Connick*, 461 US at 150). The only issue before us is whether the Appellate Division properly applied the law to the facts in these cases in reaching its conclusion that the school district failed to meet its burden.[1]

---

1. The majority asserts that we may ignore the Appellate Division's application of the *Pickering* test to the facts of this case because the balancing of competing interests is a question of law (majority op at 267 n 9). To the extent the majority asserts the obvious, namely that we must ensure the proper legal

The Appellate Division found that "evidence that children were dropped off in the middle of the street due to the arrangement of the [teachers'] cars provided a rational basis" for the arbitrators' decisions and that the awards were not arbitrary and capricious (*Matter of Santer v Board of Educ. of E. Meadow Union Free Sch. Dist.*, 101 AD3d 1026, 1027 [2d Dept 2012]). The majority concludes that the "potential risk to student safety" was enough to end the inquiry and satisfy the school district's burden (majority op at 267). However, the Appellate Division went further and considered whether the evidence showed that the teachers' actions disrupted the school's operations enough to outweigh the teachers' First Amendment rights. This is the inquiry required under the *Pickering* balancing test (*see Pickering*, 391 US at 568 [the State must "arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees"]).

Faced with the teachers' First Amendment challenge, the Appellate Division was within its authority to consider all of the evidence in the record to determine whether, as a whole, the record could support the school district's claims of disruption (*see e.g. Bose Corp. v Consumers Union of United States, Inc.*, 466 US 485 [1984]; *New York Times Co. v Sullivan*, 376 US 254, 284-285 [1964]; *Brasslett v Cota*, 761 F2d 827 [1st Cir 1985]).

Based on its analysis of the facts as found by the arbitrators, the Appellate Division concluded that the public employees in these cases had exercised their First Amendment rights to speak about matters of public concern, specifically the collective bargaining agreement dispute (*Santer*, 101 AD3d at 1028; *see*

---

analytical framework is applied to the case at hand, I agree. However, that is not what the majority has done in this case. The majority has supplanted the Appellate Division's analysis outright, even though that court applied the proper legal standard, and no abuse of discretion is discernable from the opinion's consideration of the record before it. This is not an appropriate exercise of our power of review, for as I have stated in my dissent, our task in this case is to ensure that the facts support the conclusion, not, as the majority would have it, to recast the facts to support the majority's view of what it considers to be the consequences flowing from the events.

Even were I to adopt the majority's approach to our review of the Appellate Division's decisions in these cases, I would still dissent from the majority's conclusion that the District satisfied its burden because the facts failed to establish disruption to the school, or, at most, the evidence of disruption is no greater than the evidence that no disruption occurred.

*Clue v Johnson*, 179 F3d 57, 61 [2d Cir 1999]). The Appellate Division further concluded that the school district failed to satisfy its burden of establishing that the petitioners' exercise of their First Amendment rights so threatened the school's effective operation to justify the imposition of discipline against them.

The Appellate Division's conclusions that the school failed to act to stop the demonstration or to otherwise clear the way for the students are wholly supported by the record. The record shows that petitioners and the other teachers' cars were legally parked; any member of the public could lawfully park on Wenwood Drive during the same time and in the same spots where petitioners were parked. The curb cuts were open and clear for pedestrian crossing. As a matter of course, student drop-off occurs on both sides of Wenwood Drive, requiring students dropped off across the street from the school to negotiate traffic in crossing the street. The school administrators did not intervene to help students or request that the teachers move their cars at any time during the morning demonstration. Only several minutes after traffic congestion formed did the administrators call the police and then in order to assist with the traffic jam. Even after calling the police, administrators did not take action to reduce any obstruction to the students' drop-off. Nonetheless, no students were injured the morning of the demonstration. The teachers cleared their cars from the road at 7:50 a.m., before the parking prohibition came into effect at 8:00 a.m. Santer and Lucia both arrived at work on time.

The majority ignores the Appellate Division's conclusions, and instead makes its own findings regarding the petitioners' actions, concluding that the evidence "demonstrated a potential risk to student safety that outweighed the First Amendment value of petitioners' speech about collective bargaining" (majority op at 267). The majority reaches this conclusion because the parked cars caused traffic congestion requiring the students to exit in the middle of the street in the rain. That determination, however, is based on the majority's rejection of the Appellate Division's application of law to the facts and the majority's reliance on the arbitrators' finding of a risk to the children, without regard to facts showing the risk not to be substantial.

The majority's factual findings fail to address the constitutional question; whether the speech so affected the school as to disrupt its "effective and efficient fulfillment of its responsibilities to the public" (*Connick*, 461 US at 150). The arbitrator

failed to consider whether the risk was of the type to affect the school in a constitutional sense, and the Appellate Division was well within its authority to consider the teachers' claims and apply the *Pickering* balancing test to the facts in the record. While dropping a student in the middle of the road may well be a risk and one worth avoiding, the question is whether *that* risk on the day in question was *substantial enough* to disrupt the workings of the school. To make that determination, the Appellate Division properly considered the morning's events in full, including the school administration's lack of urgent response to the situation. I can find no error of law in this analysis. While others may reach a different conclusion on the facts—as the majority apparently does (majority op at 266-268)—it cannot be error as a matter of law to find on these facts that the school district failed to carry its heavy burden.

To the extent the Appellate Division found persuasive those facts related to the school administrators' actions in concluding that the speech did not substantially disrupt the school's operations, we are bound by that fact-finding, supported by the record evidence as it is. Alternatively, if the facts could support either conclusion equally, that is they support a finding of school disruption as well as a finding of insufficient disruption to the school's workings, then the findings are in equipoise, and the school district has failed to carry its heavy burden. Unlike the majority I would not tip the balance in favor of the District where it has failed to meet its evidentiary burden.

In addition to the "potential risk to student safety," the majority also bases its decision on what it calls "evidence of 'actual disruption' to the school's effective operation" (majority op at 267). According to the majority, 16 teachers arrived late due to "traffic caused by the parking demonstration" (*id.*). However, there is scant record evidence that the parking demonstration caused teachers to arrive late, and the majority is the first fact-finder to reach this conclusion. The Appellate Division discusses only the risk to children created by the parking activity, perhaps because that was the only basis given by the arbitrators for their arbitration award.[2]

---

**2.** The majority's reliance on evidence that 16 teachers signed in late on the day of the demonstration is misplaced because there was no finding by the arbitrators that this evidence established disruption to the school, and therefore, testimony that teachers arrived late does not constitute, as the majority would have it, "record evidence of actual disruption" (majority op at

The majority's decision is flawed not only because the majority has dubious authority to make findings of fact, but also because it misconstrues the *Pickering* balancing test and its application to the facts in the record. According to the majority, the public employer need only "make a substantial showing that the speech is . . . likely to be disruptive" (majority op at 266, citing *Waters v Churchill*, 511 US 661, 674 [1994 plurality]). The majority relies on the plurality opinion in *Waters* in support of this legal standard. It is true that the plurality in *Waters* concluded that courts should give deference to a public employer's reasonable predictions of disruption (*Waters*, 511 US at 673). However, *Waters* concerned the procedures a court should use when evaluating a government restriction on employee speech. Here, the issue is whether, given the absence of any indication of disruption beyond school administrators' self-serving testimony, those administrators had reason to discipline the teachers. In any event, this case does not involve the administrators' prediction of disruption, but rather whether a disruption actually took place. The teachers were disciplined after the fact, not as a preventive measure to avoid possible disruption.

The Appellate Division did not abuse its discretion by concluding that the school district failed to satisfy its burden because the danger created by the petitioners' parked cars was not substantial. Therefore, I would affirm the orders of the Appellate Division.

Judges GRAFFEO, READ and PIGOTT concur with Judge ABDUS-SALAAM; Judge SMITH concurs in result in an opinion; Judge RIVERA dissents in an opinion in which Chief Judge LIPPMAN concurs.

In each case: Order reversed, with costs, petition denied, and arbitration award confirmed.

---

268 n 10). Of course, if it did, we would expect that the arbitrators would have found as much.